All right. Good morning or good afternoon. Judge Greenberg, you're on, sir? I'm here. Okay, great. Counsel? How come with your name, sir? Yes, Your Honor. Auden Adjoian. Adjoian? Yes. Yes, Your Honor. Okay, very good. Thank you. Go ahead. Thank you, Your Honor, and may it please the Court. Auden Adjoian on behalf of Appellant Ronald Clark. With the Court's permission, I would like to reserve three minutes of my time for rebuttal. Very well. Go ahead, sir. Ronald Clark's trial centered on two issues, eyewitness identifications and an alibi defense. Trial counsel did virtually nothing to investigate either issue. As a result, the jury considering Mr. Clark's fate was unaware of devastating impeachment material with respect to two eyewitnesses and mistakenly believed that Mr. Clark's alibi was only supported by uncorroborated testimony from two lifelong friends. But for counsel's failures, there is a reasonable probability that Mr. Clark would have been acquitted, particularly in light of the dearth of any other evidence supporting conviction. Let me ask you this question. So if I understand the record, the first trial is just Mr. Clark and the second trial is Mr. Clark and Mr. Dwight. Is that right? That is correct, Your Honor. So tell me how we should think about the application of Strickland when the dynamic, when the trial dynamic is arguably different in the second trial than it is in the first. Your Honor, I don't think that there is really any difference in the way the Court So for instance, right, to maybe help frame it, if you think about Schaefer's testimony, and you'll tell me if I'm off on anything, right? So Schaefer says that Dwight, she saw Dwight with the umbrella and the gun, yes? Yes, Your Honor. Okay. And sees him going in and there's nothing mentioned about Clark, as I recall, from that witness, right? Correct, Your Honor. Okay. And sees Dwight come out. She, correct, she sees Dwight only, correct. Yeah, yeah, yeah. Come out. So at the second trial, Dwight's a defendant. Correct. Right? Isn't the potential reception of that testimony different in a trial when Clark and Dwight are co-defendants? Because we are talking about reasonable probability of a different result, right? So the different result is not another hung jury, right? A different result would be an acquittal? That is correct, Your Honor. The different result would be an acquittal. With respect to Ms. Schaefer specifically, I don't see how anything about the fact that Mr. Dwight was a co-defendant in the second trial would have burdened the beneficial nature of her testimony with respect to Mr. Clark. She did not report seeing him at all. And regardless of what she had to say about Mr. Dwight, the beneficial nature of her not seeing Mr. Clark would have been the same with Mr. Clark alone as a defendant or with the two of them together as co-defendants. But in particular, what I'd like to discuss is with respect to the alibi, there's absolutely nothing that would be viewed differently with respect to the two of them. I don't understand about your alibi argument. If Mr. Berger can't confirm the October 7th informing of the offer, right, as I understand it, he says, I have no specific recollection. I have no vague recollection. I have no recollection at all. I can only tell you that this is my general practice, right? Correct. Okay. So if that is the nature of the testimony, how is that so you've framed it as being the most powerful evidence. Am I right? I think that it is incredibly powerful evidence, John, yes. It's more powerful than the two witnesses you've alluded to. So you say. It corroborates the two witnesses, and therein lies its power. Okay. So then let me frame the question. So if Berger can't corroborate October 7th, then what's the power such that there's a reasonable probability of a different result? Your Honor, Mr. Berger, it is correct. He does not have a specific recollection that, yes, I can say with certainty that I communicated this offer on October 7th. What it is, as we've set forth in the briefs, is habit or routine practice evidence. It is plainly admissible under Pennsylvania law. The Pennsylvania Supreme Court did not suggest that Mr. Berger's testimony would be inadmissible. We've cited case law, I believe it's in our reply brief, that indicates that precisely this type of habit or routine practice evidence is both probative and sufficient to establish. He had the stipulation, and the stipulation would have allowed one to draw the same inference, because it was such a short number of days, and maybe it was over a weekend even, that between the time Mr. Clark interviewed and the time he took the job, there were so few days that the inference would be he got an offer during that period and would have allowed the jury to view the roommate's explanation of what they were all doing that day with that in mind. So like Judge Greenway was saying, how does the Berger testimony of my habit, even if we go your way, my habit is to convey an offer after a positive reference check, so powerful that it would change the result when the jury had in front of it the stipulation that would lead to the same reasonable inference? Two points, if I may, Your Honor. There's no question that it's undisputed that the job offer must have been communicated at some point between October 6th when Mr. Clark applied and October 11th when he reported for his first day of work. But for my initial point, I would just like to read a brief snippet of Harvey Jarvis, one of the two alibi witnesses' testimony, which I think perfectly illustrates how Mr. Berger's testimony would have been so powerful to solidify and corroborate this alibi testimony from Mr. Clark's two roommates. Mr. Jarvis is asked, and this is in the appendix at pages 10, 16 to 17, he's asked by defense counsel essentially, what is it that caused you to realize that October 7th was an important date? And this is Mr. Jarvis' response. I said, that's almost impossible because that was around the time he had interview with the Rittenhouse. He's then asked a follow-up question by counsel and states with certainty it was impossible. So I submit that the first answer was his honest answer. He remembers generally that it was around this time, and he knows that they were celebrating at home on the night of the job offer. He just doesn't remember specifically that that was October 7th. Mr. Berger fills in that blank. He says it was, he doesn't say it was October 7th, but it would have been a permissible inference based on his habit or routine practice that it was in fact October 7th. I have to get back to Judge Swartz. We've seen the tag team a lot today, but I have to get back to Judge Swartz. See, if the stipulation is in the record, right, that means the argument is available in summation, and the information is before them for their consideration. So is your point that having Berger subject to the following cross-examination would be as powerful? Do you have a specific recollection of it being the 7th? No. Do you have any recollection of it, whether it could have been the 8th? Yes, it could have been. It could have been the 9th? Yes, it could have been. But I usually don't do it that way. I usually do it on the 7th. Okay. So, I mean, that is much more artfully put, I'm sure, and time is not an issue, but that would be essentially part of the cross, right? So if the stipulation is available, the argument is available to be made, I'm not seeing the power of the Berger testimony for a reasonable probability of a different result. Again, Your Honor, with respect to the first point, we submit that the jury would have been specifically alerted to the fact that it was October 7th, and it's powerful because it's within all of our common experience about habit or routine practice. We all have our habits, and so certainly Mr. Berger would have been subject to cross-examination at that time, but a juror reasonably could have believed, and under Pennsylvania law was entitled to believe, that this, in fact, happened on October 7th. And my second point would just be that, as we've noted in our brief, Defense Counsel's stipulation was bungled. What he ends up stipulating to, ultimately, is that October 10th was the only date on which essentially there was notification that he had accepted the job. And so that was confusing to the jury. There is this one form, basically Mr. Clark signed a form saying that he was acknowledging he was a part-time employee and therefore wasn't going to be entitled to benefits. As the Commonwealth has conceded, it seems likely that this form was just simply misstated, but it is confusing that there is this one October 10th date in there when everything else is signed on October 11th. Therefore, it's reasonably probable that the jury misunderstood that Mr. Clark was, in fact, hired on October 10th. And that really detracted from the stipulation itself and made it incredibly unlikely that the jurors, having heard that, would have believed that he was, in fact, hired on the 7th. Can we go back to the Schaeffer testimony for a second? Yes, Your Honor. You're, I'm sure, very familiar with how deferential we must be to a fact finding, that it can only be rejected if it's rebutted by clear and convincing evidence. Yes, Your Honor. Is it fair to say that when the state courts viewed the Schaeffer and Bell testimony as not contradictory, a fact finding that we would need to leave undisturbed unless you can show by clear and convincing evidence it's been rebutted? Because the conclusion of those state court judges was Schaeffer and Clark, I'm sorry, Schaeffer and Bell, both on the street, they didn't necessarily see the same things, so their accounts of what they saw doesn't make them conflicting. They just accounted for what they saw. And since there is this conclusion by the courts they were not contradictory, isn't that a fact finding that we need to defer to unless you can show it's been rebutted? Yes, Your Honor. Two points, if I may. First, we submit that under E-1 we have overcome that presumption of correctness by clear and convincing evidence. We submit that the two documents are irreconcilable with one another. But more importantly, Your Honor, the question is not whether these two statements are inherently or irretrievably contradictory. Ms. Schaeffer's statement clearly benefits Mr. Clark. The question is whether defense counsel had a duty to investigate and present evidence that supported his client's defense. Ms. Schaeffer supported his client's defense. It was exculpatory with respect to Mr. Clark. Counsel should have presented her or, at the very minimum, spoken to her as a witness. I see that my red light is on here. Your red light is on, but two things. Judge Greenberg, do you have any questions? You know, I wondered whether Fault was giving him questions. Most of the people who were involved here were sort of from the area, I gather, where the Wayne Junction. But Boulder, I thought, had specific significance because he was a stranger to everybody in a sense. I wondered if his evidence would have been more important. I'm sure I might have looked at him with a kinder view. Absolutely, Your Honor. I would agree with that. And that is precisely what happened in this court's very recent case on Bonk, Dennis v. Secretary. That was in the Brady context, but the Brady materiality standard is the same as the Strickland prejudice standard. And in Dennis, this court found that the witness in that case, about whom information was withheld, was a stranger to, or had no, not necessarily a stranger, but was an impartial witness with respect to Mr. Dennis. Therefore, her testimony was going to be much more powerful than his other alibi witnesses, all of whom were friends and family members. Doesn't that actually vote in favor of defense counsel's, trial defense counsel's decision not to challenge Taggart because he had a misidentification theory? I mean, what you just said actually bolsters his decision-making and makes it a good strategic decision, right? I would respectfully disagree with that, Your Honor. First of all, Ms. Taggart had already testified that she did not know or recognize Mr. Clark. So whatever theoretical reason he had for being afraid that she would testify that she really did know him would have been contrary to her prior testimony. But in addition, under the specific facts of this case, an admission, if she did subsequently admit that she knew Mr. Clark, contrary to her prior testimony, would not have been particularly damaging here. Because when she first speaks to police, she just gives a general description of the shooter. She doesn't say, it was Mr. Clark, who I've known for a long time. She then, when she's picking out the photo from the lineup, doesn't say, oh, yes, it's number three, Ronald Clark, who I know. I recognize him now. She just says, it looks like number three. So if she had known Mr. Clark, one would expect that she would have said something to police about that. You know, what's interesting about Taggart, though, is in order to persuade us that there would be a reasonable probability of a different result, we have to conclude that the letter would unequivocally work to Mr. Clark's favor. I mean, I wonder whether you agree. I won't assume. Do you agree with the proposition that there are certainly a myriad of scenarios in which the use of the letter could actually work to Mr. Clark's detriment? For instance, the affirmation that the police didn't adversely influence her, for one. I mean, I understand that it looks like number three is not great evidence, but to the extent that there's an affirmation that the police didn't influence me, that's not good for Mr. Clark. Well, just to begin there, Your Honor, to be clear, Ms. Taggart testifies at the PCRA hearing. She says that she does not recall having been coached by the police, and she sort of retreats from her declaration in which she said she only picked Mr. Clark because she was threatened by police, but she repeatedly said during the PCRA hearing that she was threatened with six months in jail and that she was afraid as a result of her drug habit and as a result of needing to care for her daughter. She also testifies that she has no recollection that she was threatened for six months in jail if she didn't help. She says she was threatened because of the retail theft. So her declaration is contradicted by her PCRA testimony in significant ways.  Unquestionably, Your Honor, but the point is, as we look at this, shouldn't our perspective be that if this piece of evidence, or I'm sorry, if this person was used, no, this piece of evidence is bad, but if this person was used, the result would have been unequivocal. The result would clearly require us to say there is a reasonable probability of a different result, and in the absence of that, this seems like kind of a mishegoss, right? What are we to conclude by the fact that it's not clear and unequivocal that, you know, there are many ways in which her testimony could have gone? Your Honor, I don't think that this Court needs to be 100% unequivocal, to use Your Honor's term, satisfied that Ms. Taggart's, impeachment of Ms. Taggart, whether by use of the letter or an investigator who had interviewed her, would unequivocally, without question, have benefited Mr. Clark. The Strickland standard is a reasonable probability of a different outcome. Here, Ms. Taggart essentially testified without any meaningful impeachment that Ronald Clark was the person who shot the victim in this case. There was absolutely no inkling that the jury had that she was a severe, long-term drug and alcohol abuser who was, in fact, intoxicated on the night of the shooting. They viewed her testimony as having been totally consistent without wavering at all points, when, in fact, she had, just weeks before his second trial, specifically written a letter saying that she could not identify the shooter. And she did not retreat from that most critical element of her letter during her PCRA testimony. So, just those two things, standing alone, create a reasonable probability of a different outcome. But she also testified at the PCRA hearing that she had no recollection of writing the letter and that she must have been prompted to write it. Use of that letter, as a result, could have, as I think the transcript reads, could have opened up a bunch of problems, including an inference, at least, that someone was trying to influence her testimony between the first and second trial. So, isn't it reasonable for a defense counsel to go with a strategy that worked to get him a hung jury and not put his toe in that water, particularly after how the PCRA testimony went and how it just was completely contradicted by the declaration. It was contrary to the declaration. That would have been a huge risk, don't you think? Your Honor, in theory, that would have been a risk. However, that just speaks to the need to investigate. This comes straight out of Strickland, Wiggins v. Smith, this Court's decision in Showers v. Beard. Strategic decisions are only reasonable to the extent they are informed by reasonable investigation. And if we look at Ms. Taggart's testimony at the PCRA hearing, specifically on this whole question of whether it was engineered, she gives sort of a very vague indication that someone must have said something to me about this in order to get me to do this. She's asked on cross-examination whether she recalls anybody from Mr. Clark's family approaching her between the two trials. She says, no, I don't recall that. She's asked on cross-examination, isn't it true that the only reason you wrote this letter is because you were scared? She says, no, that's not true. I can't say that. And in reality, this has been presented as this horribly nefarious thing that somebody sort of put her up to this under threat. It's really not all that different from what Mr. Bell testifies to in why he ultimately comes to his third statement implicating Mr. Clark. He says, well, I spoke to my grandfather, and he encouraged me to tell the police. It's not so different. I mean, there's no reason to think that it's really any different from Ms. Taggart. It could have been as simple as that. And the Commonwealth isn't suggesting that Mr. Bell's testimony is somehow infirm because he didn't independently decide to go to the police for the third time. Let me ask you this question. So the strategy employed led to a mistrial in the first trial, and obviously guilty verdict in the second. If the strategy employed led to a mistrial, how can using this, which is not great, but certainly it's an acceptable outcome if you're a defendant, you employ the same strategy, but you get a different result. How is employing the same strategy, and unfortunately for Mr. Clark, getting a different result supportive of IAC? How do you balance that? Your Honor, I would suggest that the mistrial is indicative really of the weakness of the Commonwealth's case, not of any particular strength of the strategy that defense counsel employed. If it were the case that any time a mistrial is obtained, regardless of what defense counsel did the first time around, regardless of how little investigation he did, then per se the strategy was reasonable and he should not have done anything differently. But there's just no suggestion in the case law that I'm aware of that merely because an adequate result, I suppose, in the first trial was obtained, ultimately an unsuccessful result, Mr. Clark was retried, convicted, and initially sentenced to death, that there's any reason to suggest that counsel could not be ineffective when he could have done so much more at both the first trial and the second trial. I mean, there's a reasonable probability that he would have received an outright acquittal at the first trial, and the second trial would never have happened. I don't have anything further, Judge Greenberg. Okay, thank you, Judge Greenberg. Thank you. Thank you, Your Honor. Good afternoon, Your Honors. My name is Joshua Goldberg, and I represent the Commonwealth of Pennsylvania's official respondents, the FLEs. Your Honors, as Strickland v. Washington tells us, the impulse to want to attribute an unsuccessful result at trial to something that counsel supposedly should have done differently, that's natural. But it has to be avoided. In this case, I think my best argument as to why counsel wasn't ineffective is that even with the benefit of hindsight, 20-plus years and all the investigation that trial counsel supposedly didn't do, I think we've actually managed to make, and even several opportunities to reinvent, the theory of ineffective assistance of counsel. We've actually managed to strengthen the prosecution's case pretty significantly. That's not the standard, but I think it certainly illustrates why counsel wasn't ineffective. I wanted to address some of the points that came up during my friend's opening argument. When he said that there wasn't a distinction between Nigel Bell deciding that he wanted to come clean and told what he knew in that remarkable letter by Sherry Taggart, there's no meaningful difference? Sure there is. We had a state post-conviction hearing, and the state courts found as a fact that she didn't willingly and independently write that letter, assuming that she wrote it at all. I mean, the state courts clearly found as a fact that she was put up to writing it and that the letter was entirely unreliable. And as to the argument that counsel didn't adequately investigate it, we see from the transcripts, even though I imagine that trial counsel wasn't provided his entire file to look at until just before, and he wasn't entirely familiar with everything he'd done 10 years before, he's walked through his notes of a telephone call with the defendant's mother, who was the one who relayed the letter to counsel, and counsel obviously concluded correctly that the letter was both unreliable and radioactive. Radioactive in the sense that it indicates a very strong connection between the defendant, or at least the defendant's family, a very close one, and the witness, which is exactly something that counsel didn't want the prosecution to know about. And so that's why the theory of ineffective assistance to counsel has had to change, I think, from counsel should have used the letter directly to, well, that doesn't work either. Well, how about the point that Schaefer's testimony, I mean, you make the argument that Schaefer's testimony is essentially consistent with Bell's, and I think your adversary makes a different argument, and that is that it's actually inconsistent because Schaefer does not see Clark, or doesn't testify with regard to seeing Clark. Schaefer says that she sees Dwight with the umbrella and gun on the way in, and sees Dwight, as I recall it, no umbrella, no gun on the way out. That's quite right, Your Honor, and actually the point that Your Honor made about how there is a different dynamic in joint trials, that's actually absolutely correct. And I would have to say that I'm not aware of many prosecutors who wouldn't gladly have made that tradeoff were defense counsel. I wouldn't say counsel is necessarily ineffective for calling Nicole Schaefer as a witness because the range of reasonable threshold assistance is supposed to be very broad, but I think it would be a terrible strategic blunder to put her on the witness stand as a defense witness, who they're arguing is a neutral, disinterested witness. I mean, at trial, one of the arguments is, who's to say that Nigel Bell is even out there that night? There was a suggestion during closing arguments, I think the co-defendant's closing argument, he's given all these inconsistent statements, who's to say he's even out there that night? Well, if either defendant is foolish enough to put Nicole Schaefer on the witness stand, I would wager that fully a quarter to a third of my closing argument as the prosecutor is going to be about all the ways that Nicole Schaefer's testimony is consistent with and reinforces Nigel Bell's testimony against all of the attacks on his veracity and credibility because he's made prior inconsistent statements. And in particular, there's also the statement about, which I put in the supplemental record, that wasn't raised in the initial brief, about how the shotgun magically materializes on Nigel Bell's doorstep the day after the crime, which, I mean, during the state court briefing, one of the arguments was it was incomprehensible that you would let Nigel Bell testify to that without challenge. And on that, Nicole Schaefer also corroborates him. And that is important for several reasons. First, because it's probably the weirdest thing that Nigel Bell testifies to, that he has a confrontation with Kevin Dwight after the shooting, after which, within a day of the murder, the shotgun materializes on his doorstep. And then you have Nicole Schaefer, his fiancée, completely corroborating that. One of the other arguments made at the trial was that confrontation after the shooting, where Nigel Bell comes up and says, you know, what happened in there? That guy you gave the gun to, he killed my cousin. The argument is, well, he's clearly embellishing. That couldn't have happened. Nicole Schaefer's second statement strongly corroborates that in a couple of ways. First, it corroborates it in part because it just generally bolsters his credibility. So you don't want us to look to the state court's view that they weren't contradictory, from the point of view that they didn't see the same thing, that they were in different positions, wanted to do a different ground? No, I absolutely do, Your Honor. My point is just that attempting to make a claim like this of contradiction by omission is the legal equivalent of attempting to draw an inside straight. And I think the state courts reasonably concluded that on this record that you don't have the goods. If you put her up as a defense witness and she says, no, when you're reading into this statement, it's not what I was attempting to communicate, and as I sit here today, I don't know it as a fact to be true, that's not right. If she testifies to that, and again, their only offer of proof as to what she would have testified was in her police statements, and they said, well, and if we don't get what we want from her with her police statement, we would just impeach her with her own police statement. This witness that we're putting on as a disinterested observer, as a defense witness, we're going to turn around and cross-examine and impeach her with her own police statement. If you're at that point, I mean, the case is pretty much over. You have enhanced Nigel Bell's credibility tremendously. I don't understand how. If they didn't see the same thing, how is it that she enhances his credibility? Only in the event after the shooting? Before and after. If I'm the prosecutor, especially when you think about the attacks that were made on Nigel Bell's testimony, including that he's even out there, my closing argument would say, here's what we know now that we've heard from Nicole Schaefer. There's a suggestion. Who's to say that Nigel Bell's even out there that night? Maybe he's just repeating things he heard in the neighborhood as if he saw them. No, we heard from this defense witness. He's out there that night and in a position to see. He's not making that up. We hear that Kevin Bright is a guy who hangs out in this hot lot with a shotgun concealed in an umbrella. Sounds crazy, but, again, don't take Nigel Bell's word for it. We heard it from this disinterested defense witness. We know he's got the shotgun before the murder, and we know that even though she doesn't hear the gunshot and can't place exactly when the shooting happened, we know that in the commotion that happens after the shooting, she doesn't have it. You said he doesn't have it. I'm sorry, Kevin Bright doesn't have it anymore. We know that much. I see. And also, I admit the strangest thing that Nigel Bell testifies to, that the day after the murder, the shotgun is dropped off in a trash bag on his doorstep. Lo and behold, we've heard from this defense witness who called as an impartial, dispassionate, disinterested defense witness, that's all true, too. And that also corroborates his testimony is that he confronted Kevin Dwight afterward. There was an explicit suggestion at the trial that says he couldn't possibly have gotten into the deli after the shooting, gone out of the deli to confront Kevin Dwight, and then gotten back into the deli to see the body again by the time the police get there and lock the doors. Nicole Schaefer's going to corroborate that part of his testimony in at least two ways. First, because we know that Nicole Schaefer has gotten into the deli before the police get there. In fact, Nigel Bell's mother is already there, and she's hysterical because she thinks it's Nigel who's been murdered, briefly. And then they all are able to leave. They're all able to leave. And then by the time they get back, Nigel Bell has reentered. Nicole Schaefer et al. are locked out. And Nigel Bell, who's gone back in to see the body, is locked in because the police have gotten there. And we also know that also corroborates his testimony about his confronting Kevin Dwight on the street because what other explanation is there for how the shotgun, why the shotgun shows up on his doorstep? I think he spent much of the night at the police station, and within something on the order of half a day, if that, for when he's left the police station after giving his statement that night, the shotgun showing up on his doorstep. And it also shows, contrary to the argument made in the reply brief, the argument is, well, who's to say that Nigel Bell isn't just parroting what he hears from Nicole Schaefer? Nobody who hears Nicole Schaefer's second statement about corroborating how the shotgun shows up on his doorstep is going to believe that Nigel Bell is just parroting what he heard from Nicole Schaefer, as opposed to Nicole Schaefer just testifying about what she saw or, in this case, didn't see. Let's leave Nicole Schaefer aside for a moment. Sure. Tell me, from your point of view, how Child Counsel's performance was not deficient for not investigating the contents of the letter, looking at the alleged recantation and the alleged exorbitant drug abuse. Tell me why that would not be deficient. Again, I hope nobody thinks that this is the first time that trial counsel has gotten a letter like this or some other kind of communication that strongly suggests that the witness has been influenced. But in this case, we know that defense counsel clearly spoke to the person who forwarded the letter. We know there was that call, and we know that counsel made a determination, this letter is completely unreliable and it's radioactive. And we also know, even with the benefit of hindsight, it's correct, because we have those findings from the state court and post-conviction hearing and the post-conviction proceedings, that the letter was unreliable. And so I guess there's the two questions where it's like, I'm not entirely certain how much investigation is required to determine that a letter that is in fact unreliable is unreliable. But we know that counsel, I think he wasn't just reasonable about it. I think he was correct. And I think this case is actually stronger than it was. After all these arguments about eyewitness identifications by strangers, they have managed to not only make a non-stranger out of Sherry Taggart, they have also made a non-stranger who has been approached and influenced to writing this letter, which as the state courts found after a full dress evidentiary hearing, she did not write willingly and independently, assuming that she wrote it at all. And if I could turn very briefly to the alibi claim with Jeffrey Berger, and with respect to Judge Greenaway, I know that you want to use the phrase general practice. His affidavit didn't say general practice. He said consistent with my practice. Consistent with your honor. Make the argument. Your honor, consistent with my practice is the kind of phrase that lawyers use with drafting affidavits when they can't say it was my practice. I did this usually. I did this regularly. Your honor, it's consistent with my practice to leave my keys on the armoire when I come home every day. And if my wife were here, she would tell you that does not mean regularly. It doesn't even mean more than half the time. It means possible and maybe even within the realm of plausible outcomes, but it doesn't mean always. It doesn't even mean more often than not. That is the kind of phrase lawyers use when you can't say all the things that counsels had to argue that it means, like almost always, much more likely than not. Talk about the stipulation for a moment. Counsel mentioned that it didn't seem as powerful as one might think based on Judge Schwartz's question. I'm sorry, your honor? So Judge Schwartz asked your adversary a question about the stipulation. Yes, sir. Don't worry about the red light. The question about the stipulation and wouldn't the stipulation allow the argument to be made and an inference to be drawn that Berger would have, if given the opportunity, said essentially that the author would have been related sometime around October 7th so that the argument was possible and your adversary was saying, well, you know, the stipulation wasn't as flexible as that and couldn't have been used in that way. No, I think that the stipulation was accurate. I think it was not confusing. The record speaks for itself. I think the stipulation was accurate. It was not confusing or misleading. And I think that, more importantly, I think the affidavit, their offer of proof to the state courts about what Jeffrey Berger would have testified, doesn't add in any material way to what counsel successfully established by stipulation, which, again, lets it come in as uncontested without allowance for cross-examination. I mean, it doesn't, I mean, to say, in fact, actually if you look at pages 6 and 7 of the opening brief, they use the exact same phrase, consistent with, for arguing what could be inferred from the documents and stipulation, that same phrase again. So we don't know the exact date, but consistent with the timeline established by the documents, it could have been October 7th. That's exactly what the stipulation established, and I think the state courts and the district court were exactly correct to say that Jeffrey Berger's, the offer of proof as to his testimony didn't add in any material way to it. Okay. If the word is there for the questions? Judge. I have no questions. Oh, no. Thanks. Thank you, Your Honor. Thank you. Thank you, Your Honor. I would like to begin just with the, where we ended with the alibi issue. The notion that Mr. Berger's affidavit was not sufficiently specific enough to satisfy the Pennsylvania standard for habit or routine practice evidence is incorrect. This is from Baldrige v. Matthews, the Pennsylvania standard. It says, to be admissible, the usage must have sufficient regularity to make it probable that it would be carried out in every instance or in most instances. This is a low standard, and to the extent the court has any question or concern about what Mr. Berger meant when he said consistent with my practice, we should remand for an evidentiary hearing. I guess I thought the issue was slightly different. It's that even if you assume that he got on and said consistent with the practice, how is that in essence different than the stipulation because you get to make the same argument to the jury, and that is, hey, he got the offer was related on the 7th. That's the cause for celebration. He started on the 11th. He interviewed on the 6th. You know, the question is, is there a substantive difference such that, you know, we could come to the conclusion that we need to in order to grant the relief that you're seeking? Yes, Your Honor. If Mr. Berger had testified, counsel can stand up and say, we know that this happened on October 7th because Mr. Berger's practice was to call and offer the job on the day he checked the references. Here, all counsel was able to do is say, we know it happened on October 7th because Mr. Jarvis and Mr. Stewart said so, and we know that the job must have been communicated at some point between the 6th and the 11th. So there is an absolute substantive difference between being able to point to Mr. Berger's testimony about his practice specifically and just being able to say, well, it's in the range, so you should believe Mr. Clark's roommates. So that is the critical difference there, and that is a reasonable probability of a different result, particularly in view of the Dennis case where just this type of corroborating information from a disinterested witness that doesn't itself establish the alibi, but makes the testimony of the friends and family open to a charge of bias. If you're thinking about the woman on the bus in Dennis, it was very precise. There was a date and time as to where that woman was at the time she thought she saw Mr. Dennis. So I don't know that we can necessarily analogize this circumstance where the witness at best would have said, consistent with my practice, I deliver offers on the day of the reference check. I check references on October 7th. So it might have been October 7th. I don't think it's a perfect analogy for you because of the precision of the evidence there. If I may, Your Honor, the witness in Dennis could have seen Mr. Dennis at 2.30, I believe she said, and Mr. Dennis still could have committed the crime, even with her testimony. Well, the same thing could be here true, too, because Mr. Berger couldn't say where Mr. Clark was on the evening that he was supposedly with his friends. He could only say what he, Mr. Berger, generally does or consistently does. I'm sorry. I think we're on the same page. It doesn't necessarily rule out the whereabouts of the actor. Without question, Your Honor. We don't mean to suggest that it conclusively establishes either that Mr. Clark's alibi witnesses were correct. It corroborates them, and that's all we're saying, and that's what the court found to be meaningful and material in Dennis. I see that my light is on. Okay. I don't have any further questions. Thank you, Your Honor. Thank you. Thank you, Counsel. We are going to reconfigure with a different judge, so we're going to take just a minute or two, and we'll be back out to hear our last case. Judge Greenaway, what will we do? Conference these cases tomorrow? Yes. Yes, we will. Okay. I'll talk to you tomorrow. Very good. Thank you. Thank you. Bye-bye. Court stands in recess.